People v Chaneyfield (2018 NY Slip Op 00045)





People v Chaneyfield


2018 NY Slip Op 00045


Decided on January 4, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 4, 2018

107948

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
TYROME CHANEYFIELD, Appellant.

Calendar Date: November 14, 2017

Before: Garry, P.J., Lynch, Clark, Aarons and Pritzker, JJ.


Theodore J. Stein, Woodstock, for appellant.
James R. Farrell, District Attorney, Monticello (Meagan K. Galligan of counsel), for respondent.


Garry, P.J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Sullivan County (LaBuda, J.), rendered September 22, 2015, upon a verdict convicting defendant of the crimes of predatory sexual assault against a child in the first degree and rape in the second degree (22 counts).
Defendant was charged with predatory sexual assault against a child in the first degree and 22 counts of rape in the second degree arising out of sexual offenses that he committed against a victim beginning in 2008, when she was 10 years old, and continuing for a period of roughly five years. After a jury trial, he was convicted as charged and sentenced to an aggregate prison term of 32 years followed by 10 years of postrelease supervision. Defendant appeals.
Defendant contends that his convictions are not supported by legally sufficient evidence and are against the weight of the evidence. The legal sufficiency claim is unpreserved, as defendant's general trial motion for dismissal included no arguments directed at specific deficiencies in the proof (see People v Gray, 86 NY2d 10, 19-21 [1995]; People v Perillo, 144 AD3d 1399, 1400 [2016], lvs denied 29 NY3d 948, 951 [2017]). Nevertheless, as defendant also claims that the verdict was against the weight of the evidence, this Court must determine whether each element of the charged crimes was proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Scippio, 144 AD3d 1184, 1185 [2016], lv denied 28 NY3d 1150 [2017]; People v Boehlke, 137 AD3d 1321, 1322 [2016]).
The victim, who was born in April 1998, testified that she was cared for by her grandmother in early childhood because her mother suffered from AIDS. The grandmother died [*2]when the victim was three years old. Thereafter, the victim lived with another relative, and later moved in with a woman she described as her adoptive mother (hereinafter the mother). The victim described her relationship with the mother as "rocky," saying that "[the mother would] never really pay [the victim] no mind." In July 2008, the victim's grandfather was released from prison and began residing with the mother and the victim [FN1]. According to the victim, the grandfather and the mother thereafter spent most of their time in the mother's bedroom with the door closed.
Defendant, who was in his forties, was the mother's friend and was often present in the apartment. At first, the victim and defendant had a relationship that she described as close, friendly and an "uncle[-]type thing." The victim testified that defendant had sexual contact with her for the first time when she was 10 years old, shortly before the grandfather's release from prison. While the victim and defendant were sitting on a couch, defendant began rubbing the victim's back and then rubbed "towards [her] bottom." She became uncomfortable and went into her bedroom. Defendant followed, pulled down the victim's pants, and "[s]tarted jerking off" while rubbing her vagina with his fingers and putting his mouth on her vagina. The victim avoided defendant on his next visit, but did not tell the mother what had happened because defendant was "[the mother's] best friend." Defendant gave the victim candy, which she liked, and apologized to her. The victim testified that she and defendant then kissed and that "[i]t was magical. . . . [L]ike that was my first kiss. I was shocked, I was confused, but at the same time I was happy."
Defendant thereafter engaged in a series of acts that made the victim "[feel] special," and she believed him to be her boyfriend. Defendant told the victim that he was "in love with [her]" and gave her presents. He made frequent visits to the apartment, during which, as the victim described, he kissed her, placed his fingers in her vagina and performed oral sex on her, and she performed oral sex on him. The victim testified that defendant had sexual intercourse with her for the first time when she was 11 years old and, from then on, every time he visited. When the victim was 12 years old, she became pregnant, and the grandfather took her to New York City for an abortion. The victim lied about the cause of the pregnancy, claiming that she had been raped by a stranger. Police investigated, but found no evidence supporting the claim. The victim testified that she lied to protect defendant, who had told her that he would go to prison if their relationship was discovered.
The sexual relationship continued thereafter. The victim testified that when she was 13 and 14 years old, she and defendant engaged in intercourse "[m]ultiple times" every month. A week never passed when they did not. During this period, defendant resided in the apartment for several months, while dating the mother; the victim stated that she and defendant had intercourse every day throughout this time [FN2]. At age 14, the victim again became pregnant. The grandfather again took her away for an abortion, and she provided another false explanation, telling her family that she had slept with a boy at a party.
According to the victim, defendant would sometimes climb through her bedroom window; at other times, they had sex in the living room while the mother and the grandfather were in the mother's bedroom with the door closed, or, if the mother was away, in her bedroom. On Valentine's Day in 2013, defendant gave the victim chocolate, and she gave him a teddy bear and a poem that she had written. Later in February 2013, the grandfather caught defendant in the victim's bedroom. A "really big fight" ensued, and the grandfather chased defendant out of the apartment with a machete. The victim ended her relationship with defendant because she was "tired of getting in trouble."
The victim, who was diagnosed with bipolar disorder, stated that she did not take her prescribed medication consistently during her relationship with defendant because he told her that she did not need it. After the victim and the mother got into a "big blow out" about the victim's medication, the victim moved in with the relative who had previously cared for her. She resumed taking her medication, and eventually told the relative and a counselor about her relationship with defendant. Police were called, and the victim was interviewed by an investigator for the State Police who testified at trial.
The victim told the investigator that she and defendant had a long-term sexual relationship. She initially stated that defendant had forced her to have sex, but later acknowledged that he had not used force. She explained that she had been "embarrassed" and that defendant had "taught [her] to always . . . lie basically throughout [her] whole life because [they] had to keep [their] relationship a secret." Among other things, she told the investigator that defendant had been responsible for the two pregnancies.
After speaking with the victim, the investigator arranged for her to make controlled telephone calls to defendant, for the purpose of getting defendant to talk about their relationship. Recordings of these calls were played for the jury. During the calls, defendant repeatedly told the victim that he loved her and said that he still had the teddy bear and poem she had given him. When the victim asked defendant whether he ever thought about "the babies we had" — referring to the two abortions — he responded, "Hell, yeah, of course I do," and told the victim that he did not want to have babies with anyone but her. At another point in the call, the victim told defendant that, if he had not been with someone else after their breakup, she would have given him "so much sex . . . mad sex," and defendant responded, "I know. You know how we do. You know how we do it."
The victim testified that she became increasingly emotional during the telephone calls, as she was reminded of her previous feelings for defendant. Immediately after making the last call, she secretly telephoned defendant again, warning him to run away because he was going to be arrested. Later that day, defendant was arrested and interviewed by police. During the interview, which was recorded on video and played for the jury, defendant repeatedly denied having a sexual relationship with the victim, but he also repeatedly stated that he loved her. He acknowledged, among other things, that he had had oral sex with the victim and that there was a possibility that he had caused her pregnancies. The People also submitted the victim's medical records, which included records of the two pregnancies, as well as a teddy bear and a poem that police had found in a search of defendant's apartment. The victim identified these items as the Valentine's Day gifts that she had given to defendant.
Defendant, who did not testify, asserts upon appeal that the People's case was premised almost entirely on the victim's unreliable testimony, that the police investigation was inadequate, and that the People failed to present any forensic proof at trial. However, the jury could reasonably have credited the People's explanation that it was not feasible to collect physical [*3]evidence from the apartment due to the passage of time, and that DNA evidence revealing the identity of the person or persons who caused the victim's pregnancies was not collected because State Police investigators did not learn about the abortions until long after they occurred. Defendant also challenges the victim's credibility based upon her history of making false statements about sexual incidents, including an episode in which she had sexual contact with a boy of her own age and, at first, reported falsely that she was forced to do so. These issues, however, were thoroughly explored on cross-examination and presented credibility questions to be resolved by the jury (see People v Russell, 116 AD3d 1090, 1092 [2014]; People v Simonetta, 94 AD3d 1242, 1244 [2012], lv denied 19 NY3d 1029 [2012]). Defendant's contention that the People improperly used leading questions during the victim's direct examination is unpreserved (see People v St. Pierre, 141 AD3d 958, 962 [2016], lv denied 28 NY3d 1031 [2016]). "Viewing the evidence in a neutral light and giving due deference to the jury's credibility assessments, we find the verdict to be in accord with the weight of the evidence" (People v St. Ives, 145 AD3d 1185, 1188 [2016], lv denied 29 NY3d 1036 [2017]; see Penal Law §§ 130.30 [1]; 130.96; People v Sorrell, 108 AD3d 787, 789-791 [2013], lv denied 23 NY3d 1025 [2014]; People v Wyre, 97 AD3d 976, 977-978 [2012], lv denied 19 NY3d 1030 [2012]).
Finally, defendant challenges County Court's denial of his untimely request for a missing witness charge, based upon the People's failure to call the grandfather to testify. The request was not made until after the close of all proof (see People v Alexander, 127 AD3d 1429, 1432-1433 [2015], lv denied 25 NY3d 1197 [2015]; People v Rodney, 79 AD3d 1363, 1365 [2010], lv denied 19 NY3d 1105 [2012])[FN3]. The requesting party bears the burden to ask for such a charge "as soon as practicable so that the court can appropriately exercise its discretion and the parties can tailor their trial strategy to avoid substantial possibilities of surprise" (People v Gonzalez, 68 NY2d 424, 428 [1986] [internal quotation marks and citation omitted]; accord People v Turner, 73 AD3d 1282, 1283-1284 [2010], lv denied 15 NY3d 896 [2010]). In determining whether a request for a missing witness charge is timely, the trial court must "tak[e] into account both when the requesting party knew or should have known that a basis for a missing witness charge existed, and any prejudice that may have been suffered by the other party as a result of the delay" (People v Carr, 14 NY3d 808, 809 [2010]). Upon review, we find no abuse of discretion.
Lynch, Clark, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The victim's legal and/or biological relationships with the mother and grandfather are not fully established within the record; these familial terms were used by the victim.

Footnote 2: The victim did not provide specific dates for defendant's period of residence in the apartment, but stated that it lasted about four months.

Footnote 3: The People argue that the request was not merely untimely, but that there was no showing that this witness was knowledgeable about a material issue, and that he was not under their control, but could have been subpoenaed by defendant.